Our next case up is 413-0002, Gardner et al. versus Cole et al., which is the appearance of Mr. Roberts. William Roberts for the appellant, William Scott for the appellee. Mr. Roberts, you may proceed, sir. May it please the court, Mr. Scott. At the outset, I'd like to state what this case is not about. First, it's not about fiduciary duty. Early on, the trial court formed the opinion that we were talking about a confidential relationship, we were talking about something akin to a fiduciary relationship, and we were trying to establish something, either a fiduciary duty or something akin to a fiduciary duty. A confidential relationship does not create a fiduciary duty. A fiduciary relationship creates a fiduciary duty. A confidential relationship creates a presumption that there was undue influence that caused the transfers of the property. We're not talking about a fiduciary duty, we're talking about a presumption of undue influence. The second thing that it's not about is mental incompetence, or to use a language that's in favor today, being a disabled adult. You don't have to be a disabled adult, you don't have to be mentally incompetent to be subjected to undue influence. Cases of undue influence are both cases where the person who was influenced was mentally incompetent. They may have been elderly, as many people are, who were influenced that way. But you don't have to be mentally incompetent to be subjected to undue influence. Jessica Smith suffered a series of strokes during the last few years of her life, and she became progressively disabled. And the trial court found that after the last stroke she was mentally incompetent. So he set aside the transfer that happened after that, basing his decision on whether she was mentally incompetent. You don't have to be mentally incompetent to be subjected to undue influence. What do you have to be? You have to be influenced by someone who's exerting undue influence on you. Somebody who's persuading you to do something that you otherwise would not have done, except for this constant pressure to change your disposition. So someone fully mentally competent who is persuaded to do something because someone they know or like or trust has argued for them, that's it? No. When there is a confidential relationship, there's a presumption of undue influence. You have that presumption that there's undue influence. So you can't just talk about if somebody persuades somebody to do something. There's a presumption of undue influence here which was not rebutted by Sherry Gardner. And if somebody exercises undue influence, the court set those transfers aside. And here there was a presumption of undue influence because of the confidential relationship. Third thing this case is not about is that it's not solely about property that was in the Jessica Smith Revocable Trust. What's the standard of review in this case? Beg your pardon? What is the standard of review? It's denotable because we're talking about what the law is. You mean all that evidence that the trial court heard amounts to nothing? No, I mean that the trial court erred in determining what the law was. The trial court was deciding the case based on an assumption that we had to show a fiduciary duty or something akin to a fiduciary duty. And that's not the law. So how should we view the trial court's assessment of the testimony it heard? Well, you have to accept the trial court's assessment of the testimony it heard, but no matter what the assessment was of the testimony it heard, it improperly applied the law. It was applying the law to decide whether she was mentally incompetent, not whether she was subjected to undue influence. And applying the law to assume we were trying to establish something akin to a fiduciary duty, fiduciary relationship. Fiduciary duty and fiduciary relationship are different things. The third thing that the case is not about, it's not solely about property that was in the Jessica Smith Replicable Trust. It's about all the property that was transferred from Jessica Smith to Cher Gardner and Sean Gardner, no matter how it was titled. Whether it was titled in her trust name or whether it was titled in her individual name. She had two bank accounts titled in her individual name. Cher Gardner took her to the Bank of Gibson City and she changed the title of the bank account there so that Cher and Sean Gardner would be the death beneficiaries. Cher Gardner took her to the Busey Bank and she changed the title of the bank account there so that Cher and Sean Gardner would be the death beneficiaries. It doesn't matter that that property was not in the trust. We raised an issue about that and the court declined to rule on it. What the case is about is victimization of the elderly, which is a growing problem in this country as we have more elderly and more of them have substantial assets. As a class, the elderly are more easily victimized than the rest of us. The legislature has provided a remedy for this. They have passed the Illinois Domestic Violence Act, which defines a caregiver as a person who stands in a position of trust and confidence, which is what you have to be to be in a confidential relationship. Courts have developed the remedy of confidential relationship and undue influence. Confidential, a constructive trust will be imposed when there was a confidential relationship and the property was transferred from an elder to another through undue influence. A confidential relationship creates a presumption of that undue influence. On one side, confidence is reposed and on the other, a resulting authority and influence is gained over the other person. There are several factors that will show a confidential relationship. Not all of them have to be present. As few as one can be present in a confidential relationship. Those factors are a close personal relationship. For over two years, maybe nearly two and a half years, Sherry Gardner provided care for Jessica Smith. Jessica Smith could not have remained at least part-time living independently in her home without that care. Sherry Gardner bathed her, dressed her, took her to the toilet, prepared her meals, helped her in and out of chairs and wheelchairs. They developed a close personal relationship. Another factor is a transfer's poor health. And another one is the transfer's physical infirmities. She had suffered a series of strokes and became more and more paralyzed and had difficulty speaking, difficulty being understood, and needed assistance. Another factor is the transferee's control or dominance over the other person. How are these factors any different than those factors that are needed to show a fiduciary relationship? It sounded to me to be the same. It doesn't matter if they're the same or similar. They are the factors that show a confidential relationship, and a confidential relationship doesn't give rise to a fiduciary duty. It gives rise to this presumption of undue influence. I'm not sure I follow that logically. If the factors establish a confidential relationship, and if those factors also establish a fiduciary relationship, it would seem to me that those terms are interchangeably used. Doesn't that follow logically? I didn't create the definition of confidential relationship. The courts did in their cases. These are the factors they say create a confidential relationship. I don't think that somebody who is a caregiver is probably a fiduciary because a caregiver isn't doing what an accountant or a lawyer is doing, but they are establishing a relationship with the party where they have some dominance and control over them. Another factor is the transferee's need for emotional support. This woman certainly needed emotional support in that trapped condition she was in where she was trapped in this disabled body. And the transferor's changeable or confused mental state is another factor to be considered. I'll talk a little bit about her confused mental state. A caretaker-patient relationship is, by definition, a confidential relationship. Jessica Smith was born and raised in a farm in the rural Florida county. She spent most of her adult life in South Bend, Indiana. She married there. She and her husband never had any children. They did have a close, loving relationship. She was widowed while she was living there, and she decided to move back to Ford County to be near her only family. And with the help of her nephew, Larry, she located a house in Gimson City. She bought it. She moved in there. She had a stroke during the period that she was living in the house there. She became dissatisfied in Ford County and decided to move back to South Bend. She brought her husband's body down from a cemetery in South Bend to Gimson City, and she took it back with her to South Bend, put it back in that cemetery. When she got back to South Bend, she was not happy there. Many of her friends had died, and she was isolated there. So she came back to Gimson City. Larry helped her find another house to buy. She brought her husband's body back and buried him in Gimson City again. During the first day, she had that stroke. She had another stroke in South Bend just before she came back. She had further strokes in Gimson City. She had increasing disability. She could no longer sustain herself alone in the house, so Larry located Cherry Gardner. She hired Cherry Gardner to help her. Cherry Gardner worked part-time at first, and then as the disability got worse, she worked full-time. It got to the point where Jessica could not sustain herself all the time in the house. She spent nights in the nursing home, and in the morning she would be picked up by one of the caretakers and taken to her husband's house so she could spend the daytime in her house with her dog. Then she was taken back to the nursing home for dinner. That required help seven days a week. Cherry Gardner hired additional caretakers so that there would be coverage on the weekend when she wanted to be away. She died February 22, 2010, about two and a half years after she had met Cherry Gardner. She had altered in that period of time her disposition plans for estates to leave about half of it to Cherry and Sean Gardner. A confidential relationship existed in this case. Because of the close relationship that developed, poor health, physical condition, the complete dependence on Cherry Gardner, she could not have lived alone in that house without that help. Cherry Gardner was a paid employee. She was getting paid for this, but Jessica Smith could not have lived there alone without her. That dependence, advanced age, confused mental state, all those things resulted in there being a confidential relationship and therefore a presumption of undue influence in the transfers. In Kester v. Chile, 405 Illinois 425, the Illinois Supreme Court said some of the factors taken into consideration in deciding whether there was a confidential relationship are disparity in age. There was a great disparity. Health, Jessica Smith was in failing health. Mental condition, we have Dr. Spangler's evaluation of her in his affidavit. Attached to a motion and in his deposition, which was admitted to trial as his testimony, we have his evaluation that her mental condition was such that she was not competent to make decisions about dispositions and large amounts of money. The Chile court said the extent to which the serving person entrusts the handling of his business and financial affairs to the other. Cherry Gardner opened the mail, she picked out the bills for payment, she made out the checks for signature, she hired the extra help, she arranged for the yard work, she arranged for Jessica's medical appointments. If all this is true, except for the moment, and the elderly person involved has maintained her mental competence, why shouldn't that person be permitted to decide how she wants her property to be disposed of upon her death? There's a long established series of cases that say if they make those decisions based on undue influence... Well, you're saying that this is undue influence, but it seems to me that if a relationship exists like this, but this is a person who is nonetheless independently sharp and has her mental acuity still, it's like you're establishing an irrebuttable presumption. This person's wishes about the disposition of her property no longer will be respected. It's not an irrebuttable presumption. Cherry Gardner could have rebutted it, she did not. Well, what about all the evidence that we heard about, for instance, the financial advisor, Mr. Niswonger, who said, hey, I worked closely with this lady for years and she was sharp as a tack right up until the end, knew what she wanted to do and how she wanted to do it. Why isn't that evidence to rebut the presumption, assuming we got one in the first place? I suggest to you that the financial advisor lives by the clients he has. In fact, he changed brokerage firms at one point. He took Jessica Smith and presumably his other clients with him. That's how he makes his living. I don't think he's going to get up there and say, I was continuing to deal with this person after she was no longer competent. So you're suggesting to us that the determination of whether he's believable or not is something we should make, not the trial court? No, I'm just saying there's a reason to find that that is not evidence that rebuts the presumption. Well, who decides that, us or the trial court? The trial court didn't decide that because the trial court never understood this concept of confidential relationship and the presumption of undue influence. The trial court was merely deciding whether she was mentally competent or not and that we were trying to establish a fiduciary duty, which we were not. The trial court didn't decide that the presumption of undue influence… You sought the remedy of constructive trust. Doesn't that necessarily invoke a fiduciary duty in order for you to prevail on that remedy, on that theory? That's not what the cases say. The cases say if there's a confidential relationship and thus a presumption of undue influence and that presumption is not rebutted, the court will find the property to be held in a constructive trust for the benefit of the person who should have gotten the property. Now, the court was talking here a moment ago about how she had formerly been a sharp businesswoman, and she had been. There's evidence in here to suggest that by the time these events happened, she was not at the top of her game. Go ahead. Mr. Roberts, your time is up. You have an opportunity to address this again in rebuttal. Mr. Scott. Thank you. May it please the court and counsel. Counsel. Bill Scott for the appellees. The court indicated by way of communication to counsel that it wanted us to address the issue of jurisdiction with respect to the execution. I'm going to save a few moments at the end to try to do that. A couple of things I need to say at the beginning in responding to the argument of counsel. First of all, counsel suggested that the court set aside the last transfer because she was mentally incompetent. The last transfer being the transfer of jewelry. The court simply said there was no evidence of delivery and no suggestion of incompetence or competence. I wanted the court to be clear of that. The second thing I want the court to understand is that throughout the case and now in the appellate court, the defendant's counter plaintiffs are seeking to draw with a very, very broad brush the nature of this woman's health and mental problems and the nature of the relationship. And there's a decided turning point in that relationship, which was after she signed the trust and after she put the transfer and death provisions on the account of the bank. That was May 8th. She did the trust amendment on April 30th. Before that time, the nature of the relationship, as indicated by the evidence between Justin Smith and Sherry Gardner, was Sherry Gardner came in three to four times a week for three or four hours a day. She cleaned house, took care of the dog, and took her to lunch. That was the nature of the relationship. That's not a confidential relationship. The court suggested that the court was dealing with this as though it had to find some fiduciary relationship. The court noted in its findings on the post-trial motion, as we have noted in our brief, several times the appellate court, the Supreme Court, used these words fiduciary and confidential interchangeably. The idea is, was there the sort of relationship, and the factors counsel mentioned are true, by the time she signed the amendment to trust in April 30th, 2009. We suggest clearly not. We suggest to the court that Jessica Smith returned to Gibson City in 2007. Intelligent, articulate, independent, strong, self-willed individual. That's what all the evidence showed. That's what all the evidence showed, except the three-year post-retrospective opinion of the doctor, whose own testimony was contradicted by the fact that he said, if she was shown to be alert times three in the medical records, would that contradict that? Yeah, well, she was shown alert times three up until the very month before she died. He said, if she was able to sell her house in Rome, would that contradict your opinion? Yeah, it would. Well, that happens. And would she be able to sell a car in Rome, or buy a car in Rome? Well, then he backed up a little. His opinion was completely thrown out by the court as well as it should have been, because there's not one instance of any finding in any of his records, not one of any suggestion of any mental problem with this lady. She came to Gibson. She went to her attorney, Ellen Lee, sought advice, talked about this amendment to the trust. She called her friend, actually the adopted grandfather, David Nisbarn, her financial advisor, talked to him two or three times about this trust. This wasn't the product of a rush, somebody pushing her in the door. This is something she gave clear reflection to and thought about deeply for that period of time. So if there was a confidential relationship, we suggest there never was, because this is a woman until the very end. Even after May 2008, she had a stroke, had to come home by a car, by Sherry. Sherry became her legs, according to the testimony. Never mind. According to all the health care providers in the nursing home, from the time she went in May 2008 to the time she died, this is a woman who did what she wanted, as she wanted, on her terms. She wasn't going to be an attorney, told to do anything whatsoever. So if there was a confidential relationship, it certainly did not arise prior to the time she executed her amendment to the trust in 2008. Did Judge Basie draw this distinction on the times and his finances? Yes, he absolutely did. His order did that. The Supreme Court, Warren v. Feld, held that a fiduciary relationship extends fiduciary, and again, using the word fiduciary in exchange for confidential, in every possible case. I might understand you, then, when you say confidential, you also mean fiduciary. And I think the Supreme Court has used the same terms, if I'm not mistaken. It extends to every possible case in which there is confidence reposed and resulting superiority. The law requires this relationship must be established by proof so strong, unequivocal, and unmistakable as to lead to one conclusion. That's the standard the trial court was held to. How about Mr. Roberts' argument that because of this dependency relationship, a presumption was established of a confidential relationship, and you had to then rebut it? Well, there also has to be shown that this person, Sherry Gardner, was the procuring cause of that. Not just the fact that there was a relationship established, a confidential relationship, trust and superiority, but there has to be shown a procuring cause. As of April 2008, there was no confidential relationship. If there is a confidential relationship established, and if you can show that this person is a procuring cause, then I believe the burden shifts. But we never got there. We never got there. Crawford versus Krebs. The mere assistance of an elderly or ailing person may not be enough to establish fiduciary relationship. The difference may be different where the assistance is 24 hours a day over several months, when the patient is confined to a bed, and when there's evidence of the patient's mental process of being unfailing. Davis versus Brookie. The Supreme Court found where a grantor put herself in the sole care, custody, and control of a nursing home as a result of her enthebaled mental and physical condition, that perhaps a fiduciary relationship, again, the court's using those terms interchangeably. In read, I refer to this in my brief. I refer to it now because I believe the parallels are very distinctly close. The court announced these factors mentioned by counsel with respect to determining whether or not a confidential relationship existed. In this case, the court found no relationship, noting that Louise Henke managed her own business affairs, continued to do so up to the time of her death. She paid her own bills for the accounts she maintained at the bank. She transacted business with a tenant who farmed her land. She was neither mentally nor physically infirm. She was characterized by witnesses as a strong-willed individual who knew exactly what she wanted and what she was doing. That's Jessica Smith to a tee on April 30, 2008, when she signed the Amendment to the Trust. Counsel mentions this recent statute which creates a definition of confidential relationship in the victim of elderly abuse sector. The problem is the same thing is true with the spouse and the children. They are also defined in the same classification. The fact that they are defined doesn't create a presumption of an undue influence. The only evidence of any relationship whatsoever between Jessica Smith and Sherry Gardner before she signed that trust was a woman coming in three or four times a day, cleaning her house, taking care of a dog, and taking a lunch. That's it. In this time frame, Jessica lived at home, drove her car, a former real estate agent. She managed to settle her house from Indiana while she was in Illinois. She was described by Dean Kidd, a manager of Word and Mark dealership, as intelligent, very strong-willed, willing to take her business elsewhere, and capable of negotiating a great deal for herself. For an hour and a half they negotiated. This is the same time she's going to the bank and making a transfer on death provision. Sue Edward, a long-time officer at the bank in Gibson City, observed Ms. Smith to be quite capable, independently of making a change in her bank account by adding the pay on death. Her neighbors all concluded this is a woman, based on their observations, who was strong-willed and demanding. But this testimony of David Niswonger, this is a guy who adopted this woman, his kid's grandmother. He had no access to her. There's no suggestion he was going to lose this account if somehow she was declared incompetent. That's pure supposition, pure supposition. He said that she called him two or three times. He said, Jessica, slow down. She slowed down, perhaps not as much as he would have liked. He continued to interact with her as a friend and counselor for another year and a half after she did this. There's no suggestion that this woman was being unduly influenced. Ms. Smith acted as we all would, we hope, on the advice of those people we trust the most. The pay on death provision at the bank in Gibson City in February 2008 considered in light of the relationship at that time. At that time, this woman was there three or four hours a day, three or four times a week, and that is it. You know, the clearest indication of what happened here is that in 2010, after Larry Cole, one of the defendants counterplaced this case, went to Ellen Lee to find out that there was a change in the trust, his response, candid, Jessica did what Jessica wanted to do. Jessica did what Jessica wanted to do. He knew her, he saw her once a week, she's a strong woman. There's no showing of a confidential relationship between Ms. Smith and Ms. Gardner. Certainly by the time she signed her amendment to trust in 2008. I want to address the issue of jurisdiction, I will admit... Counsel, I guess you'd have to acknowledge the relationship between Jessica and Sherry was significant enough that Jessica transferred her marital home into Sherry's name and her bank account. There was obviously a closeness... That seems to be a little bit more than just a caregiver relationship. Well, they became friends. They obviously became friends. This woman never had any children. Maybe she became the daughter she never had. That's supposition, that's speculation. The question is, was there such a relationship that existed at that point in time that could have caused an undue influence? And the obvious answer to that question, based on the record, is certainly not by clear and convincing evidence. Supreme Court Rule 303b2 requires that notice of appeal set forth the orders to be appealed. I didn't catch it. We understand the general rule to be that the appellate court does not have jurisdiction to review orders that are not specified in the notice. In 1979, the Supreme Court ruled in the case of Bertell that an unspecified judgment would be reviewable if it was an order entered in a procedural progression leading to the judgment specified. In the Bertell case, it was an accounting that the court ordered between two co-venturers. After the hearing, the court entered a judgment in favor of one against the other. The appellant didn't appeal the order provided for the accounting, only the judgment. The court said, well, no, no, no. That order provided for the accounting was a necessary step in the procedural progression. Obviously, not every interlocutory order is capable of being appealed, whether specified or not. Otherwise, the reason for the rule has no purpose. So what's the standard? I call to the court's attention a couple of cases. Vilja Blyle versus the Vilja Wilridge found that an order dismissing five counts of the complaint was not a step of procedural progression. That's 192 Illinois Appellate 3rd 568. It was unnecessary for the court to have entered the dismissal order in order for the court to have entered the subsequent summary judgment as the other counts. Summary judgment orders to the remaining counts did not relate back. The court rightly denied the review. Case of Wells Fargo Bank versus Heritage Bank, 2013, third district case, case number 110706. Court had earlier proceeding in this foreclosure case entered an order establishing the priority of the liens. Then subsequently on the order of sale and distribution of proceeds, one of the defendants not happy with the order of priority of liens appealed, but didn't mention the order establishing the priority of liens, only the order of sale. The court said, again, this was an order that was entered in the procedural progression of the case, therefore it didn't need to be specified. Case of Hines versus Department of Revenue, Illinois Appellate 3rd 697. The court found unspecified orders for tax years were not part of the progressive appeal. In order for this court to review the unspecified April 20, 2011 order construing the trust, finding a valid execution of the trust, I believe the court must conclude that somehow that order construing the trust and finding due execution was a procedural progression, the ultimate decision, finding that there was no confidential relationship. We believe it was not a necessary step and that review is not proper, notwithstanding my failure to see it in the first place. What specifically did the trial court rule in that April 20, 2011 order? Basically, the court looked at the document, saw two or three typographical errors, and construed that this was clearly a couple of typographical errors. Looking at the document as a whole, it was clear what the person executing it wanted to do. So it logically flows in that the court said there was no problem with the execution of the document, or it wouldn't have got to the point where it specified what the paragraphs meant. That's correct. Okay. I have nothing else to say but I have a question. Okay. Thank you, counsel. Counsel, I have one more question. Yes. One of the arguments was that the trial court failed to rule on the bank accounts, and in the trial court's order, the trial court has said counterplaying the complaint for relief with respect to the decedent's home and bank accounts is denied. I presume that your argument would be that clearly shows that the trial court did rule on the bank accounts. Yes. Early in that order, the court made note of the fact that there were no bank accounts that she owned within the trust, so that there was no way for him to make a decision with respect to the effect of the trust on those bank accounts because there weren't. Okay. But the court clearly ruled as to the other bank accounts. Okay. Thank you, counsel. Mr. Roberts? With respect to the jurisdiction, we raised the issue of non-execution of the Third Amendment in a pretrial motion. The court ruled against us in that pretrial motion. We raised the issue again in the trial. We put in evidence about how she didn't execute the Third Amendment in the trust. The court did not reverse its ruling in its final order, thereby adopting its ruling in the interlocutory order as part of its ruling, and we appealed this final order, which implicitly adopted his pretrial ruling because we raised the issue again, and he didn't reverse himself, didn't change it. With respect to some of the things that Mr. Scott has said, he talks about a negotiating sale of the house or the purchase of the house. Negotiate is a value-devoted term that indicates offer, counteroffer, proposal, counterproposal. There's no evidence that Jessica Smith did anything other than walk in and pay the asking price. That's not a negotiation. It's something anybody can do if you've got the money in the bank to write the check. You don't have to be competent to do that. With respect to Dr. Spangler's notes, he was not treating her for mental incompetence. The doctor makes notes in his chart about the things he's treating her for. That's what he had in his chart. This was just an observation he made. He limited the observation. He said she wasn't competent to make decisions with respect to the disposition of large sums of money. He's a family practitioner? Yes. And he is a patient who is no longer competent and makes no reference to that? Do you find that not impeaching? I don't think you make any reference in the notes to anything that you're not treating the patient for. Why shouldn't he be treating the patient for it? What treatment can you do for something like that when they're just not capable to make decisions like that anymore? Well, if they're not capable to make that decision, are they capable of addressing decisions concerning the medical treatment, for instance, that he is providing? Why wouldn't that be something that he would think should be noted because perhaps a third party should be involved? Apparently he did not think that was necessary with respect to the treatment. It was a limited opinion he had that she wasn't able to make decisions about the disposition of large sums of money. I can't read my writing. Caregiver is by definition a person in a confidential relationship. It doesn't matter how much of the time it is. I can't read my writing. Well, let me then talk a little about the things that show her mental confusion. What about the point Mr. Scott made of dividing things up on the date basis that at the end of April before the May event that she was in a different physical condition? I suggest to you that her condition was progressively deteriorating. She had one stroke after another, and she got worse with each progressive stroke. This was a woman in her 90s, and she just was not the sharp person she had always been. Ellen Lee's affidavit, paragraph four of the affidavit. Ellen Lee says, quote, that both during my initial meeting with Jessica Smith on February 27, 2008, and on April 30, 2008, Jessica Smith related to me that her sister and niece and nephews were, and that those were, who her sister and niece and nephews were, and that those were, in fact, her close relatives. Her sister and niece and nephews. She didn't have any niece. She had her sister, whose name is a defendant here, and her two nephews, Larry and Terry Cole, who remained as defendants. She didn't have a niece. How sharp is she if she's telling Ellen Lee who her... Were her nephews married? Yes. But she didn't list them as nieces. I mean, she's talking about a... And if she's talking about married, why doesn't she say nieces instead of niece singular? Your time is up, Mr. Roberts. The defendant advised that he be re-sourced for a few minutes.